The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, thank you. You can be seated. It's a great pleasure for us to have sitting with us today Judge Loretta Bigg from the Middle District of North Carolina, specifically Winston-Salem. She's come up here to help us decide these cases and show us the way we ought to go. So Judge Bigg, welcome, and we're glad to have you once again come and join us. Thank you very much. All right, and Mr. Frank, whenever you're ready, we'll be glad to hear from you. Thank you, Your Honor. Good morning, morning. May it please the Court, I'd like to briefly frame the issues in this case so we don't get lost in the weeds, because it would be easy to do. John Coney brought this case to obtain payment of commissions from his former employer, Patrick Communications, equal to a percentage of fees payable to Patrick from specific broadcast media transactions, namely the sale of 14 television stations, in accordance with the memorandum of understanding between the parties. But the appellees convinced the district judge that Coney's actual claim was that the mere formation of the entity formed to hold the properties was the event that gave rise to his commission. Don't you describe it as the transaction? Help me understand. You describe it in the complaint as the transaction. What is the transaction? Okay, Your Honor, if you look at the complaint, there are several different statements. As a matter of fact, Judge Bedard recognized, and I'll quote his words, in an earlier order that he issued, he said, equity aside, plaintiff has made plain all along that he seeks damages as a percentage of the full profits that PCL realizes in the forthcoming spectrum auction. And he advised, he said. I saw that. But what I'd like to know is what you reference. Okay, and what we wrote in the complaint is several things. We also wrote specifically that we were entitled to commissions on the sale of the profits from the sale of the stations. And I will be happy to give you a citation to that section of the complaint. Bear with me one second. But that's exactly what we did say in the complaint. Do you not reference the transaction? I'm trying to figure out what you meant by that. There was some confusion. There was some confusion. The words the transaction really referred to the FCC reverse auction. That's what people were really, that was the whole purpose of this. To purchase these stations to ultimately be resold in connection with the FCC. Why don't you tell us the paragraph we should look at or paragraphs of the complaint that you say encapsulates the argument you're making now. Okay. Bear with me just one second because I did have this at my fingertips before. Okay. If you go to count one of the complaint, which is on page, sorry, I just lost it. It's on page. Tell us what's the paragraph. What it says is. What paragraph are you in? The wherefore paragraph. Wherefore paragraph. It says he's awarded damages against the defendant in the amount of 40% of the profits received by it as a consequence of liquidation of his interest in the investment entity. What wherefore paragraph? Where are you? I'm in the amended complaint. It's document 57. I think it's page 18. It's page 18. That's correct, Your Honor. And if you go above that, alternatively, they said they won't either convert him in cash or acknowledge an equity interest. Well, your wherefore paragraph says wherefore that he be awarded damages against defendant in such and such amount of the profits received as a consequence of the liquidation of its interest in the above described entity. What's that have to do with brokerage commissions on sales of TV stations? Because the profits would be the result. The entire purpose of this venture was to buy television stations to sell. And the fee that his employer was going to receive from that process was the proceeds of the sale of these television stations. That was the entire purpose. Those were broadcast media transactions. What's the basis of his right to that? What do you allege in the complaint is the basis of his right to that? His employment memorandum, which Judge Bedard expressly said, one of the two areas where he is entitled to a commission was in the event of a broadcast media transaction. And both experts testified that broadcast media transaction meant the sale of television stations. He got commissions for when he- Okay, that's it. I'm glad you asked that. The sale of a TV station, correct? I'm glad you asked that. Yes, he did. Wait a minute. I just asked you a question. Yes, he did. Okay. He did. He got commissions on specific transactions that he was a broker on. There were 14 television stations. Show us where in this employment memorandum is the basis for your claim, which I assume is a contractual claim, breach of contract, for what you're arguing here in the wherefore clause of the complaint. If you go to page 406, it- I'm sorry, 406, I believe. Let me just make sure. Page 406, commission rates. 20% in all collected fees paid to the company for any broadcast media transaction you broker or assist on to a reasonable degree. That's on page 406. And there is evidence in this record, clear evidence in this record, that Mr. Patrick- What's that have to do with the consequence of the liquidation of an interest- Okay. Because Larry Patrick characterized to Mr. Koenig that this was going to be a fee that they were going to receive and that that fee would be greater than any other compensation they would normally get. And he said that on a number of occasions. In particular, I refer you to an email that he said, it's at page 428, in which he said, they will pay us a fee on that far greater than the few thousand dollars we would normally get. He later on said- How does that tie into this employment memorandum? Because the entire process here, what Mr. Patrick got his interest in exchange for was his assistance, namely Mr. Koenig's work, to determine which stations were purchased. So that when they were sold, the profits would be maximized. And the entire process, the fact that an entity held the stations is immaterial. The entire process was the purchase and resale of television stations. Well, PCL didn't receive anything from those sales. What did PCL receive? PCL was entitled to receive it. Mr. Patrick conveyed it to another entity. But all of the evidence- Wasn't it the other way around? Mr. Patrick was entitled to receive it, and he conveyed it where he chose to convey it. That's what he says, Your Honor. But this is a motion for summary judgment. And the record is filled with references, not only from his partners, from emails, that PCL was the entity that was the participant here. And that certainly taken in light and most favorable to us and believed, even Mr. Ellis, who is his partner, and this should create a dispute of fact right here. He submitted an affidavit. We submitted an affidavit of his in which he said PCL was the participant. And the consideration for their interest was their agreement to provide the guidance that Mr. Connie was providing. And then he submits another affidavit attached to Apolline's reply, saying exactly the opposite. And claiming, well, I didn't have the advice of counsel. Well, we have an affidavit from my co-counsel, Mr. Ruther, that he had this affidavit for months. Numerous changes were made at his request. We met with him, and he made additional changes to this affidavit. I still don't understand how does Connie, what entitles him to that, to that compensation? It's a fee that was payable to PCL. This memorandum says fees collected. Correct. Collected, not payable. That's different. Correct. Collected. That's correct. And we don't know yet. We don't know. The auction's taking place. Okay? We don't know whether the fees have yet been paid. Now, this holding company sold its assets, and then it's liquidating by giving out the remaining property, which I assume is cash, of the corporation to its shareholders or members, if it's an LL, whatever it is. I'm still having a difficult time. I think Judge Biggs has the same questions on why is that a collected fee paid to the company that you brokered or assisted? Okay. Why not just a liquidation interest? Because Mr. Pack, because everyone viewed it as Patrick Communications' compensation for their contribution to making this profit. And, as I said, the record is clear that everyone- Why isn't that just part of the function of building equity in the company? What does that have to do with the sale? Why is that a broadcast media transaction? Okay, let me try to explain that. Let's assume instead of NRJ, because what Patrick Communications got was an equity interest in NRJ, so that when the time came, when they made the profits, PCL would be entitled to their distribution. Other partners, Titan Broadcasting got the same thing, but put it in an LLC for the benefit of his employees. But let's assume the analogy would be- Was Mr. Cooney still around? When they were sold? Not when they were sold, when they were acquired. Patrick Communications' task was completed when he left. All of the stations were purchased. They were awaiting- so let me give you an analogy that may help you understand this. Instead of PCL getting an equity interest in NRJ, let's assume that- No, it's Dumcree. It's an entirely different company. You keep saying, you keep intermixing- Well, okay, Your Honor, I want to really be clear- PCL's not getting anything. Dumcree's going to get the share. I want to really be clear here that the evidence in this record, interpreted in the light most favorable to us and believed from the partners, from everyone else, is that it was PCL's right. PCL was- As a corporation? Huh? As a corporation? PCL, Patrick Communications, was the partner. It chose, as the other partners did, to put their interest in an unrelated LLC. But it was Patrick Communications that was considered by everyone as making the contribution and being entitled to it. Is the operating agreement in Patrick Communications? What is the operating agreement? Okay. What does it say? Let me answer a couple of things I'd like to address. First of all, let me just give you this analogy because it will help you. Instead of having an interest in the LLC that owned the stations, let's assume that Patrick Communications did what it was supposed to do and set up a bank account to receive its profits when the stations were sold. The fact that it was in a bank account or it was in an LLC for tax and other reasons because the lender had rights before they did is really kind of immaterial. It was Patrick Communications' right to receive this money, and the record is clear that at least that is very, very much disputed, as the competing affidavits alone would tell you. And what this all was about was Mr. Cunney did the work that entitled Patrick Communications to get this, and the operating agreement did not, by the time the operating agreement was signed, which was December 23rd, the parties had already, Patrick Communications had already done what it was obligated to do initially and had already contributed it, and all of the venturers took their interests in unrelated, in LLCs they set up for tax purposes. And the work that you're talking about that Cunney had done is these reports that each took one day, 15 reports that each took one day? Your Honor, if you look at the evidence in this record, even Mr. Patrick says at page, I'm running out of time. Mr. Patrick said this takes an inordinate amount of time. Mr. Cunney said that he spent a tremendous amount of time on this. He said that by doing this he was not able to do work on other kinds of transactions. The evidence, the only person who says it was like a one-day thing is Mr. Patrick. But the fact is Mr. Cunney had years of expertise. He had built software to do this. And even so, it took a tremendous amount of time and effort to analyze each market, as shown by the length of time it took him to get these reports to them. And it wasn't just the reports he did. He was constantly called upon for advice. His analysis of the market was an attachment to every loan application because Fortress didn't agree to just fund the whole thing. They agreed to consider each purchase. He was employed by Patrick Communications. So why is this just not a part of his job? That doesn't entitle him to equity and all of that. We're not talking about equity, Your Honor. That's an important distinction. That's a red herring here. This was a commissionable transaction like any of the other commissionable transactions he worked on. He was promised a fee by Mr. Patrick in a year and a half of emails and correspondence and everything else about this. What's your best evidence that he was promised this fee? Okay, so Mr. Patrick says on page 428, for example, he says that when Mr. Cunningham was saying we can get paid for this analysis and that sort of thing, Mr. Patrick says they'll pay us a fee for this much greater than anything else we would have. In his exit letter, and this is uncontradicted, in his exit letter after his conversation with Mrs. Patrick in his exit interview, where she told him for the first time that since you're leaving, we're not going to pay you on your commission on these sales. And he wrote in his exit interview, this is what I was told. In his exit interview, we have to agree to disagree. So where was the meeting of the minds? We have to agree to disagree that I'm not entitled to it because I'm leaving. And Mr. Patrick, when he evaluated this letter, said that I only have minor quibbles with this. There were numerous instances. Mr. Patrick, in a year and a half, he's a lawyer. Mr. Frank, Mr. Frank, you've put your things up. The red light's been off about ten minutes. Oh, I'm sorry, Your Honor. You've got some time remaining. Let's hear from Ms. Cooperman. May it please the Court. This case involves appellant John Connie, who was a former employee of Patrick Communications, persistent efforts to try to obtain a share of a business venture, an outside business venture that was a venture created by Larry Patrick, his boss, with two other businessmen that, frankly, had nothing to do with Patrick Communications. And the lower court found and properly found that there was absolutely no evidence in the record to support Mr. Connie's claim under any legal theory. And I say under any legal theory because this has been a moving target. And I refer to the complaint. And then I listen to this argument. It appears the argument has evolved substantially from what was originally alleged in the complaint. Exactly, Your Honor. And what happened? The complaint alleges that Mr. Connie. Well, do we have anything in front of us other than a breach of contract? I don't think so. I think all there is is a breach of contract claim. I think the appellant has waived all the other claims. They raised the other claims. They raised quantum merit. They raised misrepresentation and violation of the Maryland Wage Payment and Collection Act. However, in their opening brief, they don't even really address these issues. They don't present to the court the elements of those causes of action and don't make an argument, no presenting citations. So there's no basis. I think they've waived it. Is there any basis on the merits, even if we determine that they didn't waive it? No. I don't think there's any basis on the merits, as Judge Bredar found. And, in fact, the undisputed facts establish the contrary. This is, as we look at the contract, he started his case. His complaint said, and as Mr. Frank just argued, his complaint said, under my employment agreement, which was the offer memorandum, I'm entitled to a commission for the NRJ transaction. And he defines the NRJ transaction as the creation, formation, and capitalization of NRJ, which was the entity that Mr. Patrick formed together with Mr. Bartley and Mr. Ellis, and they obtained capitalization from Fortress Investment Group. All of that occurred without Mr. Cunney's involvement, and that's undisputed. However, in his complaint, he takes credit for it. He specifically says, and I'll refer the court to paragraphs 25 through 29 of the complaint, he specifically says, but for me, Fortress would never have agreed to capitalize this venture, and NRJ would not have been formed. The deal was done. He wasn't involved in that. He admits he wasn't involved in those discussions. He wasn't involved in the negotiations. He didn't even see the deal documents. He didn't see the deal documents until they were produced in discovery in this case. He had no involvement. The deal was done by the end of September 2010, and he decides in late October and November, this is a good deal. I want to try to get a piece of this, and persistently asked Larry Patrick for a percentage, asked Susan Patrick, and they're like, no, we're not going to give it. Susan Patrick's not exactly no. She's kind of maybe, well, we'll see, that kind of thing. Her position with him is not shutting the door on it. Right. Well, what Susan Patrick says, and she explains it, she and Larry had said to the employees that if we end up making a lot of money from our NRJ investment, we may bonus employees at that time, and John Cunney approaches her, and he really, there's nothing in the record where he disputes this. John Cunney approaches her and says, well, if you're going to give employees bonuses, I don't want to wait until the deal is done, until you receive, until stations are related. Did she ever use the word bonus, or is that the construction you're putting on, what she said? No, that's what the evidence is in the record. Did she use the word bonus? She testified as to that. That's in the record. In the email to Cunney, she said, I think she says NRJ stuff. I don't think it's specific or any payment in connection with NRJ, but what she says is Larry is willing to consider doing something, and this is on November 28th of 2010. Larry is willing to consider something, but first we need to discuss a number of things, such as our investment in you, what have you produced, what about some performance goals, and how long are you going to stay with the company, because at this point he had already moved his family back to Connecticut. He was commuting back and hadn't told his employer.  They didn't know where they are. That's all that he has, but there is never an agreement, never an understanding, and clearly, again, if we go back to his contention, it's a breach of contract claim. He has an employment agreement. It doesn't fit. His claim does not fit at all within the terms of his entitlement to commissions under the employment agreement, and frankly what happened in this case when he realized that, when he realized he didn't have the evidence to show that he was the one responsible for the NRJ transaction for that deal that got the three NRJ partners together and Fortress to capitalize. When he didn't have the evidence to show that, when he couldn't show anything under the employment agreement, then he starts to argue a number of different things. He tries to argue that the NRJ transaction, well, it's not what I said in the complaint. What the NRJ transaction really is is essentially all of the business of NRJ. And so because I was doing these spectrum reports, which the Patricks describe as marketing tools to identify markets and then to identify stations that they could broker to NRJ, because I was doing these, then that should all be considered part of the NRJ transaction. But wasn't that part of his job? That was part of his job, exactly, for Patrick Communications as a broker. And the important thing here, as we explain in our brief, is that there's two separate things going on here. There's Larry Patrick together with Mr. Bartley and Mr. Ellis, getting Fortress, with their forming NRJ, which is a company that had a business plan to acquire television stations. That's one thing that was an opportunity that Larry Patrick envisioned when the FCC announced the National Broadband Plan. The other thing was that a brokerage from the National Broadband Plan, a brokerage opportunity, which Larry Patrick saw for Patrick Communications. What's that brokerage opportunity? There's going to be a lot of poorly performing television stations whose value is going to be worth more to an investor if the FCC proceeds with the reverse and forward auctions, which wasn't a certain event. So Larry said, well, what we can do if I form an entity, Patrick Communications could broker stations to that entity as well as other companies that may decide to engage in such a speculative venture. And Patrick Communications then would receive a brokerage fee, which is precisely what he did. Separate transaction, separate opportunity, and that's what he did. And that's where Mr. Cunney was involved. And in fact, Patrick Communications brokered television stations to NRJ and received fees for the stations it brokered. It identified good markets, and Mr. Cunney did the spectrum reports, which he testified took him a day. That wasn't Larry Patrick. That was his deposition testimony. But he did the spectrum reports. They said, okay, well, these are the markets we think are key. Then Patrick Communications, Mr. Cunney, and others there, went out, identified some good station prospects in the markets they identified, and presented them to NRJ. NRJ bought four of those stations. And Patrick Communications received a fee for those stations, not equity. There was never a deal for Patrick Communications to receive equity, and there's absolutely no evidence that supports that claim, that Patrick Communications received entity. And Tony received commissions on those. Exactly. He received over $300,000 in commissions over the course of 18 months for sales brokered by Patrick Communications to NRJ. That's what his job was. That was his entitlement. He was paid a salary at the same time. Exactly. He was paid a $100,000 annual salary to do his job. So he received a salary, plus the employment agreement said that on certain deals, and it was specific. It didn't say on everything you do. On certain deals, you're going to be entitled to a commission. And that's what he got. It's that simple. And he had no entitlement to any share, whether it's equity or profits, in NRJ, in the NRJ as they define NRJ transaction. And, again, I go back to not only the complaint-defined NRJ transaction as the creation, formation, and funding of NRJ, but Mr. Cunney, and we cite in our brief, Mr. Cunney in his deposition says, no, I'm talking about that. I'm not talking about the sale of television stations. Mr. Cunney's attorney repeatedly, and, again, we cite to this, repeatedly in deposition questioning defined NRJ transaction as the creation, formation, and funding of NRJ. And, again, that was totally a deal. The NRJ was a business venture by Larry Patrick and his two partners, Mr. Ellis and Mr. Bartley. And the understanding was that each of them personally had a right to receive a third interest, which ended up being a fully diluted 5% interest. Larry Patrick decided he was going to share that with his wife, who's his business partner, Susan, and they created an entity that would hold that interest. Mr. Bartley. Let me interrupt you just a sec. Does the record reflect why a separate corporation, Dumb Creek, was used to be the partner in the newly formed corporation as opposed to Patrick Communications? Well, yes, because it had nothing to do with it. But there is an email, and it's in the record. I can't give you the exact site. But the three NRJ partners said, we're going to form separate corporations. And there's actually an email where Ted Bartley says, okay, just give me the information. What are you forming? Larry Patrick has a number of different businesses, and he has different companies for the purposes of those businesses. Patrick Communications is a brokerage business. That's separate aside. He didn't mix his different business ventures. So that's why they formed. But, in fact, Mr. Bartley formed a company to hold his interest. Actually, he shared it with his family members. And that's something Mr. Frank pointed out, which is correct. Mr. Ellis invited his business partners, not his employees, but his business partners, I think he had four business partners, to share in his interest in NRJ. And they created a separate corporation. They didn't put that in Titan, which operated television stations that Mr. Ellis was the president. They formed a totally separate corporation also. So it was none of their other businesses that had any kind of equity interest in this. And each of them did indicate, well, there are services that we would be. Oh, and let me step back. In the deal documents, which are in the second volume, in the sealed volume of the record, number one, don't mention Patrick Communications at all. They imposed no obligations whatsoever on any of the NRJ partners to do anything other than they actually had to put up some money, $1 million for every $100 million that Fortress had put up. They had to do that. But they didn't have to perform any services. And they got the equity at the time that the deal closed. And that was always the understanding. Now, the partners agreed, well, Ted Bartley, you can manage NRJ. And if you manage NRJ, you're going to be paid $20,000 a month. You're going to receive separate compensation. Bert Ellis, your company, Titan, can operate the television stations. And any television stations that Titan operated, they weren't obligated. But if they did, they would receive a monthly payment, an operation fee, for each station. And then Larry Patrick, your company, can broker stations to us. And if they're successful, then we'll pay them a commission. And as long as they identify a station, if Larry could, or Patrick Communications could get the brokerage arraignment as the seller's broker and then get paid a commission from the seller's end. Or if they didn't, then NRJ said, if you identify a station and we buy it, we'll pay you the commission. So each one of them said, yeah, we can perform services. If they didn't perform the services, our companies can perform the services. If they didn't, they still received their equity, and they didn't lose that equity, but they had an opportunity to receive compensation over and above, or their companies had the opportunity to receive compensation. That's, again, a totally separate deal. And they did, in fact, receive compensation. So it's, you know, as Judge Bredar found, Mr. Connie was not entitled to anything with relate to NRJ transaction under his employment agreement. Now, when he realized the evidence didn't support his claim, not only that the employment agreement provision wasn't applicable, because it wasn't a broadcast media transaction, Patrick Communications did not receive anything, was not entitled to a fee, and did not collect anything for the NRJ transaction, and that he did not originate the transaction, the three elements required in the provision, did not originate the transaction, nor did he assist in the execution of the transaction to a reasonable degree. Then he changed his argument and said, well, I have a breach of contract. I had a contract because there was an oral agreement. Well, the evidence doesn't support any oral agreement, as we explained. He has the extraneous statements that just don't support anything that he tries to point to by Susan and Larry Patrick. There's nothing there. And frankly, the important point is that the breach of contract claim is only against Patrick Communications, not against the Patricks individually, and there's no evidence of any mutual assent. What are the terms of this oral agreement? He can't point to anything. And further, even if he had an oral agreement, that oral agreement would be void under the statute of frauds in Maryland, because it was clear that he's saying he's entitled to the… the agreement was he would get paid the profits when the stations eventually were sold, and it's a public record, so I could say to the court, the FCC conducted the auction. Finally, it completed in 2017, this year, in the spring of this year, seven years. But even in the National Broadband Plan, the FCC made clear that there was not… if the auctions happened, it wasn't going to occur into the earliest 2012 and 2013. Mr. Cunney is saying I had a deal in 2010. So that oral contract could not have been accomplished within a year, and it's void under the statute of frauds. So for all of these reasons, the summary judgment in this case was correct. The evidence doesn't support Mr. Cunney's claim, and we ask the court to affirm the judge's decision. Thank you, Ms. Kupferman. Thank you. Mr. Ruther. So much and so little time. Good morning, Your Honors. Good morning. The entire construct that this was a transaction that was separate and apart from the business dealings of PCL is at the heart of this case, and it is belied by everything that's in this record. From the very beginning of the analysis that was conducted, the questions that were asked by Mr. Bartley, the questions that were asked by Mr. Ellis, they were all directed to Patrick Communications. They were all answered by Patrick Communications, by employees of Patrick Communications, so that when the final agreements are signed, everybody had already done everything that they were supposed to do in order to earn their share of the profits from the sale of these broadcast properties down the line. Those agreements, those LLC operating agreements, didn't require Fortress to do anything. They didn't require Ellis to do anything or Bartley to do anything, but all of the evidence in the record, the documentary evidence, shows that that's what the parties exactly expected from one another when they started this transaction. I refer you to Mr. Ellis' first affidavit, one that he later changed. He says in paragraph 12, which you'll find in the appendix at 375, because the exact terms of profit participation of PCL, Bartley and Titan depended in part on the terms, the final terms of the Fortress investment, no formal agreement or documentation of that interest existed at that time. So if you look at the e-mails that go back and forth, it's Mr. Patrick telling Mr. Cunney that this is a fee for our services, a fee bigger than anything we could get otherwise. One other point. If you look carefully at the employment memorandum and the course of conduct among the parties, the other things that Mr. Cunney got paid for that he did not, that were not strictly within the terms of the memorandum, I think you can conclude that everything that Mr. Cunney did was commissionable. In paragraph 1, Mr. Patrick writes, we really prefer commission-based incentives rather than salaries, but would want to transition this so that you are not adversely affected. It was not the case, Judge Briggs, that Mr. Cunney got a salary for which he was entitled to do things, and then if he did other things, he got a commission. He was a commissioned person. If you look at the deposition transcripts that are in the record as well, this man was employed only to earn commissions on everything that he did, and the $100,000 a year was paid to him only because of the lead time involved in closing transactions. He couldn't have come to work for Patrick Communications and survived given the fact that it would take a year or so in order to get the transaction done. A brief word. So how long in total did he work for them, Patrick Communications? I believe three and a half years. Is he still pulling a salary while he worked there the whole time? I believe that he was paid a salary the entire time, that they had not reduced it to solely commissions at that point. The statute of frauds argument I want to address briefly. The Maryland law and statute of frauds is quite specific and clear. Only where there is no possibility that a contract could be completed within a period of one year is the statute applicable. And it doesn't matter whether or not the performance extends over a period of longer than one year. So this is an employment agreement. Mr. Cunney could have quit within the one-year period of time and still have been entitled to commissions. I might note that Patrick Communications paid commissions to Mr. Cunney long after he left, so there's no requirement in the memorandum or in the course of dealing between the parties that Mr. Cunney actually be there in order to have earned the commission. Also, Your Honors, the communications between the parties at the time when Mr. Cunney says, okay, this deal is done, I've made it happen, or at least I've contributed materially to making it happen, and I want to make sure that I'm going to get paid. The idea that Mr. Patrick was only going to offer commissions on the sale of television stations that might be brokered in the course of NRJ's acquiring these stations is an afterthought. He wanted that, and he didn't get it. He wanted an agreement to be the exclusive broker for all the stations that NRJ purchased, and he didn't get that at all. So whether Mr. Cunney might have gotten something from the sale of a particular station that NRJ bought down the road was completely irrelevant. The value of the transaction was the interest that they were going to get, followed by the sale of the broadcast properties that resulted from that. Thank you, Your Honor. I see my time has expired. Thank you, Mr. Ruther. We'll come down and recounsel and then go into our next case.
judges: William B. Traxler, Jr., G. Steven Agee, Loretta Copeland Biggs